Robinson.
v.
Rapelye and
Smith.

ROBINSON v. RAPELYE and SMITH, survivors, &c.

1. The answer of a garnishee in attachment is to' be taken as strictly true; and if a deed is appended, it is to be considered as genuine; unless the answer be traversed.
2. A deed of assignment by a debtor of all his effects for the benefit of all his creditors, is not void on account of the debts and property not being particularly described and specified.
3. Such deed will be operative against an attaching creditor here, though made in New-York.
4. A debtor has a full right to prefer some creditors to the exclusion of others; and may lawfully stipulate that those who accept the property conveyed shall release him; the contract being voluntary.
5. The insolvency of the debtor does not vary these rules; no bankrupt law being here in existence.

On the 4th of June 1824, Franklin Robinson sued out an original attachment against Daniel Rapelye and William Smith, as surviving partners of the late firm of Lawrence, Rapelye, & Co. of New York, (John T. Lawrence having previously died,) to recover $2213 58, which he claimed of said firm as balance of an account current. The attachment was returned to the Fall term of Marengo Circuit Court. The sheriff returued that there was no property of the defendants in his county to be found, but that he had on the 14th July, 1824, attached the amount in the hands of the firm of Glover, Gaines, & Co. and of the firm of Glover & Gaines; and that he had summoned them to appear and answer as garnishees what they were indebted to the defendants in the attachment. A duplicate writ of attachment was issued to Greene county, and Thomas H. Herndon of said county appeared as a garnishee.

At March Term, 1825, Glover, Gaines, & Co. filed their answer as garnishees; in which among other matters they stated, that they were indebted to the late firm of Lawrence Rapelye & Co. in the sum of $605 63 due by open account; but further stated that before the attachment was sued out by the plaintiff "they were notified by letter from Thomas Lawrence and others, representing themselves to be the assignees of Lawrence, Rapelye, & Co. of the failure of said Lawrence Rapelye, & Co. and that the debts and effects of said Lawrence, Rapelye, & Co. had been assigned to them for the benefit of their creditors, which said assignment is hereunto annexed." (See copy in note A.)

(A.) *Copy of the deed of assignment and accompanying certificates of probate, &c.*

(L S.) United States of America, State of New York. By this Public intrument be it known to all whom the same doth or may

At March Term, 1827, Thomas H. Herndon filed his answer as garnishee, stating that he was the agent of several creditors to collect debts due from the firm of I. & T. Crowell; that he had been authorized by all the creditors

JULY 1829.

Robinson
v.
Rapelye and
Smith.

concern, that I, Augustus Floyd, a Public Notary, in and for the State of New York, by letters patent under the great seal of said State, duly commissioned and sworn; and in and by the said letters patent, invested "with full power and authority to attest deeds, wills, testaments, codicils, agreements, and other instruments in writing, and to administer any oath or oaths, to any person or persons;" do hereby certify, that the annexed is a true copy of a certain original indenture of assignment produced before me, and duly proven before Robert L. Wilson Esquire, a commissioner for that purpose appointed; and I do further certify, that the certificates of the proof of the said indenture of assignment, on the said Indenture endorsed, (of which said certificates copies are hereunto annexed,) are the true and proper certificates of the said Robert L. Wilson, and that the said Robert L. Wilson is a commissioner duly appointed according to law, to take the proof and acknowledgement of deeds &c. and that his said certificates ought to have full faith and credit, and that all deeds and instruments in writing by him certified to be proven as aforesaid, are entitled to be read in all Courts of Justice. Whereof an attestation being required, I have granted this under my notarial firm and seal. Done at the city of New York in the said State of New York, the seventh day of April in the year of our Lord one thousand eight hundred and twenty-four. *In Præmissorem Fidem.*

AUGUSTUS FLOYD, *Public Notary.*

*Indenture of assignment.*

This Indenture, made this sixth day of August in the year of our Lord one thousand eight hundred and twenty-three; between John T. Lawrence, Daniel Rapelye, and William R. Smith of the City of New-York, merchants, composing the mercantile house, or firm of Lawrence Rapelye and company, of the first part; Peter Remson, Thomas Lawrence, and Benjamin Smith of the same city merchants, of the second part; and the several other persons whose hands and seals are hereunto subscribed and affixed, creditors of the said Lawrence, Rapelye and Company of the third part, witnesseth; that the said parties of the first part, for and in consideration of the sum of one dollar, lawful money of the United States of America, to them in hand paid at or before the ensealing and delivery of these presents, the receipt whereof is hereby acknowledged, and for other considerations, have bargained, sold, aliened, released and confirmed, and by these presents do bargain, sell, alien, release and confirm unto the said parties of the second part, and to their heirs and assigns, all and singular the lands, tenements, and hereditaments belonging to the said parties of the first part, jointly, situate in the State of Georgia, or in the State of Alabama; and the reversion and reversions, remainder and remainders, rents issues and profits thereof, and all the right, title,

among whom were Lawrence, Rapelye, & Co. to compound with the said Crowell's for a gross sum, subject to distribution among them in proportion to their demands; that he had done so, and received debts and notes payable to him

estate, property, interest, claim and demand whatsoever, both in law and equity, of them the said parties of the first part, of, in and to the same, with the appurtenances; to have and to hold the same and every part and parcel thereof with the appurtenances, unto the said parties of the second part, their heirs and assigns forever, as joint tenants, and not as tenants in common; and all deeds, evidences, and writings concerning or touching the same: In trust nevertheless, and to and for the uses and purposes hereinafter mentioned.

And this Indenture further witnesseth; that for the aforesaid considerations, the said parties of the first part, have bargained, sold, assigned, transferred and set over, and by these presents do bargain, sell, assign, transfer and set over unto the said parties of the second part, their executors, administrators and assigns, all and singular the goods, wares and merchandize, bills, bonds, notes, and other securities for money, debts, moneys, stock in trade, chattels and personal estate and effects whatsoever, and wheresoever, which the said parties of the first part are jointly possessed of or interested in, or entitled to as partners of the said mercantile house or firm of Lawrence, Rapelye and Company, and not otherwise; together with all Books of account, vouchers and other papers in any wise concerning the same; and all the estate, right, title, interest, claim and demand whatsoever of the said parties of the first part, of in and to the same. To have and to hold the same to the said parties of the second part, and the survivors and survivor of them, and their or his assigns, and to the executors and administrators of such survivor for ever: In trust nevertheless, and to and for the uses and purposes hereinafter mentioned. That is to say, upon the trust, with all convenient speed, to sell and dispose of and convey, all the said real and personal estate and property hereby conveyed and assigned, at such prices, and on such terms as the said parties of the second part, or the survivors or survivor of them, or the executors or administrators of such survivor, may deem expedient; and to collect in the discretion of the said parties of the second part, the survivors or survivor of them, or the executors or administrators of such survivor, the said debts, or sums of money, and all other the premises hereby assigned: And out of the trust moneys which shall come into their or his hands, or the hands of either of them therefrom, in the first place to retain and re-imburse themselves all costs charges and expenses whatsoever, which they respectively shall or may sustain, expend or be put to, in preparing these presents, or in and about the execution of the trusts hereby reposed in them, or otherwise relating thereto: And in the second place, out the residue of the said trust moneys, from time to time as the same shall be received in sufficient sums, for distribution; to pay and satisfy *pari passu*, and without preference or priority, to Samuel Clarke, of Augusta, in the State of Georgia, the sum of three hundred dollars due for rent &c; and

in his own name but for their account; that he had in his
hands $1824 82 as the share due to Lawrence Rapelye
& Co. or their assignees, out of said fund, subject to a deduc-
tion of about $200, for his services and expenses of col-

to such of the several persons, or mercantile firms, named in the
schedule hereunto annexed marked A, as within thirty days from
the date hereof shall execute these presents, the several debts
and responsibilities or engagements referred to in the said schedule
A, not exceeding the amounts set opposite their respective names
in the said schedule, which the said parties of the first part now
owe to the said persons or mercantile firms, or which the said per-
sons or mercantile firms respectively may hereafter pay and dis-
charge: and also to pay and satisfy in like manner any interest
that has accrued, or may accrue on the same amounts or any part
thereof: and in the third place, out of the residue of the said
trust moneys, after the aforementioned payment of principal and
interest, to pay and satisfy as far as the said residue may suffice,
*pari passu*, and without preference or priority, to such of the cre-
ditors of the said parties of the first part named or referred to in
the schedule of debts hereunto annexed, marked B, as shall with-
in two months from the date hereof execute these presents, the
sums mentioned in the said schedule B, opposite the names of the
said creditors; and all interest due or to grow due thereon. And
in the fourth place, after the payment and satisfaction of the said
debts last referred to, and the interest thereon as aforesaid; then
out of the residue of the said trust moneys to pay, satisfy and dis-
charge all other debts and responsibilities not herein before pro-
vided for, due and owing from the said parties of the first part,
or which shall become payable hereafter to such creditors of the
said parties of the first part, jointly and not severally, as shall with-
in four months from the date of these presents have executed
the same, towards satisfaction of their respective debts proportion-
ably, so far as said residue will extend to satisfy the same. Pro-
vided nevertheless, and it is hereby agreed and declared, that the
said parties of the second part may employ such clerks and agents,
to aid them in the execution of the said trust, and at such rate of
compensation as the said parties of the second part, the survivors
or survivor of them, or the executors or administrators of such
survivor may deem proper; and that the said parties of the second
part, the survivors or survivor of them, shall be allowed a reason-
able compensation for their services in the execution of the trust
hereby reposed in them, on the said trust proceeds after deduc-
ting the costs and expenses accruing thereon; which commission
may be retained out of any part of the said trust proceeds, any
thing herein before mentioned to the contrary thereof notwithstand-
ing: and it is further declared, that the purchaser or purchasers
of the said trust property, or of any part thereof, shall not be in
any wise answerable for the loss, non application, or misapplica-
tion of the purchase moneys, or any part thereof, by the said par-
ties of the second part, the survivors or survivor of them, or the
heirs, executors or administrators of such survivor; and that the
said parties of the second part, the survivors, or survivor of them,

12

JULY 1829.

Robinson
v.
Rapelye and
Smith.

lection. That in the year 1823, and previous to being garnisheed in this case, he received while in New York, a written notice that the interest of Lawrence Rapelye & Co. had been assigned to Thomas Lawrence, for himself, Peter

and the executors or administrators, or heirs of such survivor, shall be charged, and chargeable, each respectively for his own acts and defaults only, and not for the acts and defaults of the other, or others; and that neither nor any of them shall be charged with or for any sum or sums of money, other than what shall actually come to his or their hands by virtue of these presents, nor with any loss that shall happen, touching or concerning the aforesaid trust estate, or any part thereof, without his or their respective wilful default. And the better to enable the said parties of the second part to execute the said trusts, the said parties of the first part, have hereby constituted and appointed the said parties of the second part, the survivors and survivor of them, and the executors and administrators of such survivor, to be the true and lawful attorneys and attorney of the said parties of the first part, irrevocable, in the names, place and stead of the said parties of the first part, or any or either of them, but for the uses and purposes aforesaid, to ask, demand, sue for, recover and receive from the several debtors of the said parties of the first part, or any other person or persons having any of the said bargained and assigned premises in his or their possession, or custody, all and singular the goods, wares and merchandize, debts, accounts, sums of money, and other the premises hereby assigned, or mentioned, or intended so to be; and on receipt thereof, to make, seal and deliver in the names of the said parties of the first part, or any or either of them, good and sufficient acquittances and discharges therefor; and to take any legal means for the recovery thereof; and to make any composition or agreement respecting the same, or any part thereof by arbitration or otherwise, as they may deem proper; and to do all other act and acts touching the premises, as fully in every respect, as the said parties of the first part, or any or either of them could do if personally present; and one or more attorneys under the said parties of the second part, the survivors or survivor of them or the executors or administrators of such survivor for the purposes aforesaid, or any of them, to make and substitute and at pleasure revoke: and the said parties of the second and third parts, in consideration of the premises, and of one dollar to each of them in hand paid by the said parties of the first part, at and before the ensealing and delivery of these presents, do hereby for themselves respectively, and for their several and respective partners, heirs, executors and administrators, remise, release, and for ever quit claim unto the said parties of the first part, and each of them, their and each of their heirs, executors and administrators, and every of them, all and all manner of actions, cause and causes of action, suits, debts, bonds, bills, notes, accounts, claims and demands whatsoever, both at law and in equity, which against the said parties of the first part, jointly they the said parties of the second and third parts, or any or either of them ever had, or are now entitled to for or by reason or means of any act, matter, cause or thing whatsoever, from

Remson and Benjamin Smith, requiring him not to pay to any other person than one of those mentioned, the moneys which he then had, or might afterwards receive on account of said firm, unless authority was produced from them. He

from the beginning of the world to the day of the date hereof. This assignment and the trusts, and matters therein contained, and the rights, estate and interest thereby secured excepted. In witness whereof the said parties have hereunto set their hands and seals, the day and year first herein written.

*Memorandum.* It is expressly declared to be the meaning and intent of the foregoing presents, that the release and quit claim contained therein, and thereby made to the said parties of the first part, shall not be construed or taken to operate, upon or extend to any promissory note or notes, or bill or bills of exchange which have been made payable or indorsed to, or have come into the hands of any person or persons, or mercantile firm, (who shall execute these presents) as agents or attorneys for others, and have been indorsed or negotiated, or transferred by the said agents or attorneys, or any of them; but the liability of the said parties of the first part, and each and every of them on the said notes or bills of exchange respectively, to the true owners thereof, and to the several parties thereto, shall remain wholly unaffected and unimpaired; notwithstanding the execution of the foregoing presents by such agent or agents, any thing in the said assignment, or foregoing presents contained, to the contrary notwithstanding.

| | | |
|---|---|---|
| Sealed and delivered (Signed) in the presence of *Maria J. Lawrence, Thomas Lawrence,* | Jno. T. Lawrence, Daniel Rapelye, Wm. R. Smith, | [seal] [seal] [seal] |
| By Daniel Rapelye and William R. Smith in the presence of *S. P. Gregory. Jeromus Rapelye.* | Thos. Lawrence, Benj. Smith, | [seal] *As-* [seal] *sign-* [seal] *ees.* |
| Witnesses to the signatures of the assignees *Pierce V. C. Miller, Samuel A. Miller* | Henry Thomas $11,432 02 [seal] Benj. Smith, transacting business under the firm of Dunton & Smith, Thomas Lawrence, John F. Lawrence, Thomas G. Casey, | [seal] [seal] [seal] [seal] |
| *Sept. 2, 1823.* | Abraham Riker, transacting business under the firm of Abraham Riker, & Co. | [seal] |
| " 2, " | John Penfold, | [seal] |
| " 2, " | Wm. Penfold, | [seal] |
| " 2, " | George Sharp, | [seal] |
| " 2, " | James N. Tuttle, | [seal] |
| " 2, " | Thomas Tileston, | [seal] |
| " 2, " | John Herriman, | [seal] |
| " 3, " | Egbert Davis, | [seal] |
| " 3, " | John Wells, | [seal] |
| " 4, " | Thomas Van Antwerp, | [seal] |
| " 5, " | Parish Holbrook, & Co. by Hy. Parish, for $1116 36–100 in the first class. | [seal] |
| | David J. Boyd & Co. by David J. Boyd, Payne Spofford, Peter Remson, | [seal] [seal] [seal] |

further stated, that about two thirds of the amount then in hand had been collected since he was garnisheed; and that there would be, when collected, a further fund liable to distribution in the same manner as the fund now in hand.

| Sept. 9, 1823. | Samuel Hickok, | [seal] |
| " 13, " | Caleb Hopkins, | [seal] |

Witneses to the signatures of *Benjamin Smith, Thomas Lawrence, Thomas G. Casey, John F. Lawrence, Abraham Riker, John Penfold, Wm. Penfold.*

*Schedule A, of creditors, debts and responsibilities or engagements, referred to in the annexed assignment.*

| | | | |
|---|---|---|---|
| T. & J. F. Lawrence & Co. for exchanged paper, | | $26462 | |
| Do.     for endorsements of notes, | | 5451 91 | |
| | | $————31,913 91 | |
| Henry Thomas for exchanged paper, | | | 11,431 00 |
| Dunton & Smith for | ditto, | | 10,124 00 |
| Herriman & Davis for | ditto, | | 5001 00 |
| J. & L. Van Antwerp for | ditto, | | 2600 00 |
| Abraham Riker, & Co. for | ditto, | | 4627 39 |
| J. & W. Penfold for | ditto, | $4571 62 | |
| Do.     for money collected, | | 219 85 | |
| | | | 4791 47 |
| Peter Remson for endorsements in the name of Peter Remson & Co. | | $47100 00 | |
| Peter Remson for bonds to the Custom House, | | 1310 00 | |
| Do.  as security to the Bennet estate, | | 5000 00 | |
| Do.  for money lent by him, | | 2000 00 | |
| | | ————55410 | |
| David Boyd & Co. for money collected, | | | 231 66 |
| Spofford, Tilliston & Co. for ditto $441 75 and $453 70, | | | 895 45 |
| Sharp & Tuttle for | ditto, | | 567 23 |
| Parish, Holbrook, & Co. for | ditto, | | 1116 36 |
| John Wells for Stock of the Pacific Insurance Company transferred by him, and pledged or appropriated for debts of Lawrence, Rapelye & Co. | | | 16,000 00 |
| Rapelye, Bennet & Co. for money collected, | | | 1000 00 |

$145,709 47

JOHN T. LAWRENCE.

*Schedule B. of creditors and debts referred to in the annexed assignment.*

| | |
|---|---|
| Adrian Van Sinderen, | $8203 30 |
| Estate of Richard Lawrence, | 9046 79 |
| Simon Remson, | 5613 97 |

The assignees of Lawrence Rapelye & Co. appeared by their counsel; and due notice by publication having been given to the defendants in the attachment, and they failing to appear, the plaintiff, at March term, 1827, moved the

| | |
|---|---:|
| Adrian Van Sinderen and William Lawrence, Guardians of Richard Lawrence and Isaac Lawrence, sons of Richard Lawrence, deceased. | 3493 11 |
| William Lawrence, | 1829 22 |
| Thomas R. Lawrence, | 3678 26 |
| Ulpian Van Sinderen, | 4558 49 |
| E. A. Underhill, | 100 |
| Caleb Hopkins, | 1187 05 |
| Estate of Gillespie and Campbell, | 1613 25 |
| Creditors of Russell, & Co. | 1864 62 |
| Samuel Hickok, | 1224 21 |

$42,411 27

JNO. T. LAWRENCE.

STATE OF NEW-YORK, } ss.
    City and County of New-York,

On this thirtieth day of December, in the year of our Lord one thousand eight hundred and twenty-three, before me Robert L. Wilson, a commissioner in and for the City and County of New-York, duly authorised to take the proof and acknowledgement of Deeds, &c. personally came and appeared Seth P. Gregory of the said city, (to me known,) who being by me duly sworn according to law, on his oath did say, that he was present and did see Daniel Rapelye and William R. Smith, known to him to be the same persons described in, and who executed the within indenture of assignment, duly execute the same, for the uses and purposes therein contained; and that he the said Seth P. Gregory, together with Jeromus Rapelye, became subscribing witness to such execution. All which being to me satisfactory proof of the due execution of the said Indenture of assignment by the said Daniel Rapelye and William R. Smith, and there appearing no other material erasures or interlineations therein, except those noted I do allow the same to be recorded.

    (Signed)    ROBERT L. WILSON, Commissioner, &c.

STATE OF NEW-YORK, } ss.
    City and County of New-York.

On this thirty-first day of December, in the year of our Lord one thousand eight hundred and twenty three, before me Robert L. Wilson a Commissioner in and for the city and county of New-York, duly authorised to take the proof and acknowledgement of Deeds, &c. personally came and appeared Maria J. Lawrence of the said city (to me known,) who being by me duly sworn according to law, on her oath did say, that she was present and did see John T. Lawrence, known to her to be the same person described in, and who executed the within indenture of assignment, duly execute the same, for the uses and purposes therein contained; and

Court for judgment by default against the defendants, and also for judgment against the garnishees on their statements filed. But the Court, being of opinion that the deed of assignment referred to and produced, and the notice thereof given by the assignees, protected the debts in the hands of the garnishees, overruled said motions, discharged the garnishees and rendered judgment for costs against the plaintiff.

*Robinson*, assigned the judgment of the Court below for error, alleging several reasons why it should be reversed.

VAN DE GRAAFF, for the plaintiff in error. Our attachment was levied on *choses in action* of the assignors, not assignable, either by the principles and policy of our own laws, or by those of New York. Consequently, the legal interest in the rights and credits attached still remained in the defendants, after the assignment; and *at law*, the garnishees must be regarded as the debtors of the defendants, up to the time of the levy of our attachment. A Court of law merely, cannot, without invading the province and peculiar jurisdiction of a Court of Chancery, take notice of the assignment of balances due upon mere open running accounts; and the assignor to whom such balances are due, is regarded, *at law*, as the creditor, after the assignment: otherwise, surely, in an action by the assignee of a chose in action, not negotiable, the defendant would not be permitted to set off a demand due to him from the legal plaintiff; but this, the defendant would in all cases be allowed to do; and he would thereby in effect defeat the assignment, to satisfy a debt due from the assignor.[a]

*a* 7 Term Rep. 667. Chit. on Bills.

This deed of assignment was made in New York. It transfers the whole estate of the assignors in Alabama, real and personal, to the assignees: the very property upon

that she the said Maria J. Lawrence became a subscribing witness to such execution. All of which being to me satisfactory proof of the due execution of the said Indenture of assignment by the said John T. Lawrence, and there appearing no material erasures or interlineations therein, except those noted, I do allow the same to be recorded.

(Signed)      ROBERT L. WILSON, *Commissioner, &c.*

Recorded in the Office of Register in and for the city and county of New-York in Lib. 172 of Conveyances, page 309, on the 31st day of December, 1823, at half past one o'clock, P. M. Examined by      JAS. W. LENT, *Register.*

Endorsed Lawrence, Rapelye, & Co. to Peter Remson and others, A true Copy.

AUG'S FLOYD, *Public Notary.*

which, principally, their credit was acquired and sustained here. Its object is also to prefer New York creditors, to the exclusion of creditors elsewhere. Now although our Courts perhaps would not hesitate to carry into effect the provisions of this deed, as to all persons who are parties to it, they would surely not be required to enforce its provisions against our own citizens, not parties to it. The legal right of an insolvent debtor to prefer a particular creditor, or class of creditors, is not disputed; but the mode in which this right is attempted to be exercised, ought to be unexceptionable. It ought to be with the knowledge and consent of the creditor intended to be preferred; a direct assignment of specific property to pay a specific debt or debts; and it should be done without incurring unnecessary and heavy expenses and charges upon the debtor's estate. But this deed was executed by the assignor without the knowledge or consent of even the preferred creditors; and their number and the amount of their demands, as well as the value of the property transferred, is wholly unspecified. The expenses which must necessarily be incurred in effectuating the provisions of the deed, cannot but be very large; the funds consequently which ought to be exclusively appropriated to the payment of the debts of the defendants, are unnecessarily diminished and wasted away.

This assignment being a contract made in New York, between citizens of New York, our Courts will lend their aid to effectuate its provisions, as against any person whatever, only from the principles of comity. Would it not be carrying the principle too far, to support the deed against, and to the ruin of our citizens? Lord Mansfield, in the case of *Le Chevalier, assignee of Dormer v. Lynch,*[a] seems to have been careful in the choice of his terms. He says "In Scotland, they permit assignees of a bankrupt in England to sue for money owing to the bankrupt in Scotland; but only where their own citizens would not be thereby exposed to unjust injury." Mansfield further observes, that it has been determined at the *cockpit*, that bills by English assignees *may* be maintained in the plantations upon demands due to the bankrupt's estate. But if in the mean time, after the bankruptcy, and before payment to the assignees, money owing to the bankrupt out of England is attached, *bona fide*, by regular process, according to the law of the place, the assignees in such case cannot recover the debt." By the laws of Scotland, all effects of a foreign bankrupt, situated in Scotland, are secured for

JULY 1829.

Robinson
v.
Rapelye and
Smith.

a Doug. Rep.
169.

JULY 1829.
Robinson
v.
Rapelye and
Smith.

the benefit of Scottish creditors; and in turn, they will not in England, permit a Scottish creditor to come in under the assignment for a share of the bankrupt's estate, unless their priorities at home be relinquished.    That an assignment under the bankrupt laws of a foreign State, would not be supported here against our own attaching creditors, cannot at this day be controverted upon principle or authority.[a]

One objection to voluntary assignments like this, is, that they may be used in aid of foreign bankrupt laws, and if enforced here against our own creditors, every foreign bankrupt may establish and dictate to our citizens, an individual bankrupt law of his own.    Support this assignment against our attaching creditors, and you send our own citizens abroad to collect their debts: you permit interested foreign merchants to change the party liable, and no summary mode of redress against fraudulent assignees exists in such cases, as in cases of bankruptcy.    Nor can it be expected, in general, that such voluntary assignments, where the assignees are chosen by the bankrupt himself, will be conducted with the same propriety and justice, as assignments under the foreign bankrupt laws.    It would consequently be more dangerous for our Courts to sustain voluntary assignments like the present, than to adopt and enforce the bankrupt laws of foreign States.[b]    Voluntary assignments in England of the character of the one now under consideration, are void, because they operate against the policy of the bankrupt laws.    They should be held void here, when made abroad, because they operate against the policy of our attachment laws, which allow a citizen to attach the effects here, of a non resident, to satisfy his demands.

The deed of assignment itself is void and fraudulent as to creditors.    An assignment made of all the effects of the assignor is fraudulent if it reserves a trust to the assignor. Now the assignment in question contains a trust for the benefit of the assignors; the effects assigned, are according to the deed of assignment, to be appropriated to the pay ment of such creditors as shall sign the deed, release, &c. in certain periods mentioned.    No creditors who do not make themselves parties to the deed and release, are to be paid any thing.    Now suppose no creditor chooses to accept the terms offered in such an assignment, or only a few, upon a secret understanding, and whose debts would consume but a small share of the property assigned, I would ask if the property assigned, or the surplus, would not be

a Topham v.
Chapman.
1 Const. Rep.
229, 20 Johns.
Rep. 229. 259.
1 Doug. 170,
4 Day's Rep.
146. 5 Mass.
Rep. 42.
5 Cranch 289.
6 Binney 353.
4 Johns. Ch.
Rep. 460.

b 4 Day's Rep.
146. 5 Mass.
Rep. 144.
13 Mass. Rep.
146. 17 Mass.
Rep. 454. 552.

held by the assignees for the use of the assignors? If an
assignment like the present could be supported, it would
be easy to place property out of the reach of creditors; only
assign your effects to a pliant trustee, upon an agreement
with all your creditors except the one intended to be
fleeced, that they will not become parties to the deed, and
then, if the terms prescribed in the deed be so unreasonable
that the intended victim will not accept them, the proper-
ty assigned, no matter where it may be situated, is effectu-
ally put beyond his reach.

The proof of the execution of the instrument is insuffi-
cient to authorize this Court to recognize it; the making,
sealing and delivery of the deed, is not established accord-
ing to the rules of law.

HITCHCOCK and ELLIOTT, for the defendants in error,
argued that the deed of assignment was not void or fraud-
ulent in law, and that a debtor could legally prefer one cre-
ditor to another;[a] that wherever, according to the English
authorities, assignments not fraudulent in point of fact
have been set aside, in consequence of the preference giv-
en by the debtor in embarrassed or insolvent circumstan-
ces, to a particular creditor or creditors, it was in cases in
which their Courts invariably assumed the position that
the assignment was executed contrary to the spirit of, or
in contravention of the provisions of the bankrupt law of
England;[b] that issues not having been tendered to contro-
vert the shewing made, or the facts stated in the answer of
the garnishees, that all the facts stated in the answer were
to be taken as true,[c] and that therefore the plaintiffs were
precluded from contending that the parties were under any
legal disability, or that the deed was not duly executed,
or that it was not supported by adequate consideration, or
in a word, that it was fraudulent; because the answer was
not traversed. They further argued, that no judgment
could be rendered against the garnishees, nor against the
defendants in attachment, because, unless the garnishees
were liable, the process of attachment being a proceeding
*in rem*, there was nothing subject to the attachment upon
which a judgment could be legally predicated;[d] and that
therefore, the judgment should be affirmed.

KELLY, in conclusion.

The cause was argued at the July term, 1828, of the
Court, and held under advisement, and after a second argu-

---

JULY 1829.

Robinson
v.
Rapelye and
Smith.

a Marbury v.
Brooks.
7 Whea. 556,
572. Phenix
v. assignees
of Ingraham,
5 Johns. Rep.
412. 3 Johns.
Rep. 72.
20 Johns. 229.

b Potter v.
Brown,
5 East. 125.
Ingliss et al.
v. Grant,
5 Term 530.
c Allen v. Mor-
gan, 1 Stew-
arts R. 9.

d 3 John. R. 72.

JULY 1839.

Robinson.
v.
Rapelye and Smith.

ment at this term, the opinion of the majority of the Court was delivered

By JUDGE COLLIER. On the answers of the garnishees, the plaintiffs moved the Court below for a judgment against them; which motion was overruled, and a judgment rendered by which they were discharged. The correctness of which judgment is now assigned for error. In determining this question, two points are presented: 1. The legality of the deed which accompanies the answer of Messrs G. G. & Co. 2. The extent and effect of its operations.

The counsel of the plaintiff insists, that the deed cannot be recognized as valid, and that it is a fraud in law upon the creditors of the assignors who have not executed it, for these causes:

1st. Because there is no proof of execution by the assignors, trustees, or any of the creditors, nor of the delivery of the property conveyed.

2d. Because there is no specific description of the lands, personal estate, notes, accounts, &c. and the debts proposed to be secured.

3d. Because it gives a preference to some of the creditors over others.

4th. Because it is in itself the making of a bankrupt law, for the benefit of the assignors.

We are inclined to the opinion that the deed, for any thing appearing on its face, is valid at law, without an execution of it by any of the creditors of the assignors. It conveys all their property, without an estimate of its value, for the payment of three hundred dollars to Samuel Clark, and then to such other creditors as might execute it; no act is required to be done by Clark, to entitle him to the benefit of the deed, but as to him, the deed becomes immediately operative on its execution by the assignors. Nor is it considered of the essence of the deed that the trustees should have executed it, or assented to the trust; if they had refused, equity could appoint others in their stead, with all powers which the deed conferred.[a]

But the deed purports to have been executed by the assignors, assignees, and some of the creditors; and were it necessary, we might presume an execution by all the parties whose names appear, and more especially by the creditors, as it is for their benefit.[b] It is however unnecessary to resort to presumption, for the answer of the gar-

a 7 Whea. 556.

b 2 Kent's Com. 421. Pease v. Owen, 2 Hayw. 284.

nishees must be regarded as strictly true; and even if the deed be disregarded, no judgment can be rendered against them on their answers, because they state they have been advised that the assignors have transferred their claims against them. We must take the assignment to have been legal, unless its illegality appeared from the answers, or from the deed accompanying them, or had been made manifest by the finding of a jury on an issue taken on the answers. This doctrine was settled by this Court in *Allen v. Morgan*, at January term, 1827. And as no issue was taken on the answer of the garnishees, if it were necessary, from the circumstance of the deed appearing to have been executed, we would presume a delivery of the property conveyed, as it recites the fact. But here the doctrine of presumption need not be invoked, for if no delivery has been made, the rights of the assenting creditors cannot be prejudiced, unless they dispensed with it, or did some other act from which fraud is inferable. No act of the trustees can affect the assenting creditors, unless they in some degree contributed to it; because the trustees are only agents for the assignors.[a] The facts so far as developed by the record, discover no improper conduct by the assenting creditors.

[a] 7 Whea. 556.

With regard to the generality of description of the property conveyed, and of the debts intended to be secured, this cannot be held to invalidate the deed. However proper it might be to require a specific description of property, where a conveyance is made for the security of a particular debt, that it might appear that the security was not largely disproportioned in value to the amount of the debt, we should hesitate before we could say, that that circumstance, would, of *itself*, avoid such a deed. But where a debtor conveys his entire property for the benefit of all his creditors, we are unable to discover any sensible reason why he should particularize each object. As every thing is given, it will not be, to be distinguished from other property; and as it is granted for the payment of all the creditors, it cannot be objected that it is greatly disproportioned to the debts of those who have come in under the deed. Nor have we been able to discover any reason why the lands conveyed should be described by metes and bounds; they can be identified by the title papers, which it is presumable were in the possession of the assignors; and when the trustees have made out a title in the assignors, they can use the deed as evidencing an assignment of that title to them-

JULY 1829.

Robinson
v.
Rapelye and
Smith.

selves. But even suppose the title would not be good at law, the powers of Chancery might be invoked against the assignors, by a purchaser from the assignees, and a decree obtained for a more perfect conveyance. It is even enough if the deed passes the equitable interest in the lands; it is now well settled that such interests shall at law be protected from attachment.

It is a well ascertained rule of law, that the right of the debtor to control his property is full and complete, and not subject to restraint by law, until the creditor acquires a lien upon it.[a] In countries where bankrupt laws obtain, a different rule of jurisprudence prevails; it is there held, that the effects of the bankrupt must be distributed among his creditors according to the provisions of a certain law, and that a distribution upon any other scale, would be a fraud on it, and consequently void.

*a* Hatch v. Smith, 5 Mass 42, Putnam v. Dutch, 8 Mass 287, Widgery v. Haskell, 5 Mass. 1?1, Stevens v. Bell, 6 Mass. 339, Thomas v. Goodwin 12 Mass. 14 Cushing v. Gore, 15 Mass. 74, Hendrick v. Robinson 2 John. Ch.R 283 M'Hemony v. Ferreis, 3 Johns. 72, Murray v. Riggs, 15 J.R. 571, Austin v. Bell, 20 John. 442, Wilt v. Franklin, 1 Bin. 502 514, Marbury v. Brooks, 7 Whea. 556.

The right of the debtor to dispose of his property being then uncontrolable by law, where there is no lien already attaching in favor of the creditor; it follows necessarily that he may secure the debt of one creditor in preference to another, and that the security given cannot be prejudiced by the insolvency of the debtor, if the creditor has not acted improperly in obtaining it.

That the deed is the making of a bankrupt law, for the benefit of the assignors, is an argument which we think cannot be well founded. Before, with any degree of justice, it can be assimilated to a law, it would be proper to shew that it was compulsory upon the creditors: this we apprehend will not be insisted on. The creditors may or may not assent to its provisions; if they yield their assent, they must be paid as it directs, if they withhold it, they can only look to the property conveyed after the debts of the assenting creditors are satisfied. This objection, we conceive, acquires no weight from the fact, that the assent of the creditor operates a release of the liability of the assignors from payment, on a deficiency of property for that purpose; for, as already remarked, he is not forced to assent. It seems to be the better opinion, that a debtor may indirectly exercise a coercion over his creditors, by requiring them, if they take a benefit under the deed, to give a release.[b] The commentator refers to authority, and none that we have seen maintains the converse of the position.

*b* 2 Kent.Com. 421.

The counsel of the plaintiff insist, that the assignors had no greater control over their property, without the jurisdic-

'JULY 1829.

Robinson
v.
Rapelye and
Smith.

tion of New-York, than the law has in England over the estate of a bankrupt. In answer to this argument, it may be proper to shew how far a sequestration, by a commission of bankruptcy, operates upon the estate of the debtor. The law in relation to bankruptcy is municipal in its character, owing its force and operation to the Legislature of the particular country, and not dependant upon any rule adopted by the community of nations for the adjustment of commercial intercourse; hence it follows, that its influence is limited to the government that adopts it, and that it cannot operate upon the citizens of another nation, that has had no agency in its enactment, and can never have assented to it, as forming rules for judicial action within its sovereignty. In this view we are well sustained.[a] Lord Kames, in his "Principles of Equity," [b] in discussing the question as to the effect and extent of the English bankrupt laws, says, "law cannot force the will, nor compel any man to make a conveyance. In place of a voluntary conveyance, when justice requires it to be granted, all that the Legislature can do, is to be themselves the disposers: and it is evident that their deed of conveyance cannot reach any subject, real or personal, but what is within their territory." In *Harrison v. Steeny*, [c] Chief Justice Marshall says, "the bankrupt law of a foreign country is incapable of operating a legal transfer of property in the United States." Other authorities are to the same point. [d]

Having shewn the extent of the influence of an assignment by positive law upon the estate of the debtor; we propose next to inquire, whether there be any analogy between such an assignment, and one made by the debtor himself. In respect to the right of the owner to control his property, it is assumed as a correct rule, that, in time of peace, personal property has no locality; and that therefore it is competent for him to dispose of it by any legal conveyance, though it may at the same time be without the country of his residence, or the place where the conveyance was executed. A different rule might seriously affect trade, and would require an inhibition upon the transfer of property to an impolitic extent. Lord Kames, in his "Principles of Equity,"[e] speaking of the distinction between a transfer by the party himself and of a commission of bankruptcy, says "the former has no relation to place; the latter, on the contrary, has the strictest relation to place, and reaches not lands or moveables *extra territorium*." Chancellor Kent, in *Holmes v. Remson*,[f] and Chief Justice Par-

a Mandersly
v. Park and
Beckwith,
1 H. Bla. 680.
Homes v.
Remson,
20 John. 254,
Platt's opin-
:ion.
b 4th Edit 573.

c 5 Cranch
289.

d Milner v.
Moreton,
6 Bin. 353.
Taylor v.
Gear, 1 Kirby
313, Wallis
&c. v. Pat-
terson, 2
Harris and
M'Henry 463,
13 Mass. 146,
2 Hayw. 24,
12 Whea.213,

e 4th Edit. 573

f 4 John. Ch.
R. 460.

sons, in *Goodwin v. Jones*,[a] both agree, that such is the effect of a conveyance by act of the party; and contend, that a conveyance by act of the law operates co-extensively with the law. In relation to lands, they may be conveyed by the employment of those ceremonies which the *lex rei sitæ* has made essential to a transference of right; though they be not situate in the country where the conveyance is executed. This proposition seems to us legitimately to result from the idea of private property, and a conclusion flowing from what we have said in relation to personal estate.

It is not pretended to question the right of any country to regulate, by positive law, the disposition of personal property found within its limits, so as to give a preference to its attaching creditor over the assignees of a non resident debtor. Such a right we believe to exist when it has not been abolished by the restrictions of fundamental law. But when this right has never been exercised, it is compatible with the rights of sovereignty for the legal forums of every country, to give effect to a conveyance by act of the party; and in point of law, they have no discretion in refusing their aid. We have no statute which sequesters the estate of the non resident debtor, though insolvent, for the benefit of the resident creditor, and cannot therefore deny to the deed the effect it proposes.

The reason employed, sustained as it is by authority of the highest respectability, we think most manifestly shews, that the parallel insisted on between the two descriptions of conveyance, cannot with justice be drawn: the one is voluntary, the other *in invitum;* the one is the act of the party, the other the act of the law; the one reaches the estate of the assignor wherever it may be, the other only where *intra teritorium*.

Having patiently investigated the case, we are of opinion, that the Court below decided correctly in refusing a judgment against the garnishees, and the judgment must therefore be affirmed.

By JUDGE SAFFOLD. The questions presented by the various assignments of error are: 1. Does sufficient evidence of the due execution of the deed of assignment appear to have been offered to the Circuit Court, to defeat the plaintiff's attachment? 2. Is the deed on its face legal and valid according to its stipulations; or by legal construction, is it fraudulent and void? No evidence is furnished of the execution of the instrument, except by the assignors: their

JULY 1829.

Robinson
v.
Rapelye and
Smith.

execution is certified by a notary public, but neither the notarial certificates, or any other shewing, testifies any thing respecting the signing or sealing by either of the assignees or creditors. It is true, the deed transmitted to the garnishees, perhaps by mail, and by them shewn to the Court, purports to have been executed by two of the assignees and some twenty creditors. It cannot, however, be overlooked, that the garnishees admit their indebtedness to the defendants, and state they received notice from the persons named as assignees, of the transfer by deed as above described, but they do not profess any knowledge of the genuineness of the deed; or claim any interest in it. The state of the question is therefore essentially different from what it would be in a case where the assignors are summoned as garnishees, and claim title in themselves, either individually, or as trustees for the benefit of creditors, and consequently deny any indebtedness to the defendants in the attachment. In a case of the latter description, the answer not only denies that any thing is owing, but expressly, or by implication, avers the due execution of the deed. Under such circumstances, the plaintiff must acquiesce, or, pursuant to the statute, *deny the truth of the answer on oath*, and take issue upon it.[a] But in this case, an issue could not with propriety have been joined on the facts of the answer; for it avered no material fact, except the admission of their indebtedness, and it would have been perfectly nugatory to contest the statement that a deed as described had existence, either genuine or spurious, and that the garnishees had notice of it.

Evidence of the execution by the assignees, may be dispensed with, and the fact of their assent presumed; or if it be otherwise, Chancery is competent to remove the difficulty by compelling them to appropriate the funds according to the directions of the trust. If the assignment was absolute for the payment of all or any portion of the creditors, without requiring their release or assent as a condition precedent, then as they could have no inducement to refuse, their assent might be presumed, as was done in the case of *Brooks v. Marbury*.[b] But where the act of becoming parties to the deed by executing it is expressed as the only condition on which they could claim any interest under it, neither the case referred to, or, as I think, any others cited, give any sanction to the doctrine, that their assent is unnecessary to the validity of the assignment. And as I view the subject, the assent of at least a

a Laws of Ala.
17.

b 7 & 11 Whea.

JULY 1820.

Robinson
v.
Rapelye and
Smith.

*a* 1 Monroe's
R. 104.

*b* 14 John. 496.

number of creditors whose demands together, bear a reasonable proportion to the value of the property assigned, is indispensable to the validity of the deed; otherwise it is perfectly evident, the grossest fraud may be committed with perfect impunity.

In a case decided in the Supreme Court of Kentucky, as late as 1824, *M'Kinley v. M'Clombs,*[a] this principle was maintained in terms far less qualified. There, a deed of trust had been executed by Grimes of all his estate real and personal, expressing to be in consideration of five shillings, and for the payment of his creditors, without naming any of them; neither of the trustees were creditors, nor did it appear that the creditors were consulted, or that they consented to the conveyance. A bill was filed by a creditor against the trustees, to set aside the deed, on the ground of fraud. Chief Justice Boyle, in delivering the opinion of the Court, said, "notwithstanding the trustees allege in their answer that they accepted the trust at the request of some of the creditors, yet there was in the cause no proof of the fact, and were it admitted to be true, it could not affect those creditors who had not made such request, or otherwise given their consent to the conveyance." He remarks further, "it is to be sure reasonable, that the creditors who consent to a conveyance of this sort, should be bound thereby, and ought not to be permitted afterwards to object to it; but it is plain they could not bind other creditors who did not consent to the conveyance." He adds, "the deed of trust must therefore be assumed to be made by Grimes to strangers, and not to creditors, for the payment of his debts, and such a deed is merely *voluntary and without consideration.*" That the consideration of five shillings, expressed, would be considered as merely nominal, and could affect the interest of no one but the assignor himself; that the deed as to purchasers and creditors, must be considered as fraudulent and void. This he said was the doctrine of the English books, under the statute of Elizabeth, of similar import to the statutes of Kentucky, against frauds and perjuries. The same may be said of the statute of this State and probably of New-York; and it may also be remarked, as was done in the case of *Sands v. Hildreth.*[b] that the statutes for the prevention of frauds in the usual form, have been universally considered as expositions of the common law. The assignment in the case thus reported, appears to me to be far less exceptionable than the one under consideration; and if the doctrine as

maintained in that case be correct, it is impossible that this assignment can be valid against the rights of dissenting creditors. There, the creditors, to claim under the deed, were not required to release their demands against the true debtor; here it was the only condition on which they could have any claim; there the trustees answered on oath that they accepted the trust at the request of some of the creditors; here a paper is produced purporting to have been signed and sealed by a few of the presumed numerous creditors, and this is the only evidence of their assent, without a particle of proof of the genuineness of their signatures.

It is true the sum of $300, appears to have been appropriated by the deed to the payment of Clark, of Augusta; the language is rather ambiguous whether this was absolute, or on the condition prescribed for the other creditors, that he should execute the deed; but admitting it was absolute, can it be tolerated for a moment that an assignment in trust for the payment of several hundred thousand dollars, can be preserved from the fraudulent taint by a specious pretext securing the contemptible sum of $300? The schedule annexed to the deed, purports to contain an inventory of only the favorite creditors, and exhibits debts in their favor, to the amount of about $200,000!! Whether any of these debts have a real existence, or are merely fictitious, is equally destitute of proof, or even an affidavit by the garnishees, or any of the parties to the deed, or other person. It may, however, be assumed against those claiming under the deed, from the amount of debts inventoried, and various other indications, that this was one of the most extensive mercantile establishments in the United States. But whether the estate purporting to be assigned was of the value of $100,000 or a $1,000,000, is equally uncertain. What kind of property, what proportion of land, or personal estate, or where it is to be found, is left equally doubtful. No article of property is described, nor is the name given of a single debtor to the firm.

The execution of the deed by the creditors, or their assent otherwise given to its terms, would constitute a waiver of these objections as to them; but the position I assume, is that this deed is not shewn to have been assented to by any creditor: also, if it were shewn that the creditors who purport to have joined in the execution, have in fact done so, and that they were *bona fide* creditors for the respective sums mentioned, yet as their just demands may not equal half the value of the estate, and as the assignors have

14

JULY 1829.

Robinson
v.
Rapelye and
Smith.

*a* 11 Wheat.
73.

avoided giving any account of it, and as none can claim under the deed, except such as have joined in the execution of it, and thereby released their claims on the firm, no others can be affected by it. It is admitted that this plaintiff, and many other creditors, have refused to execute the deed; the consequence of which must be, that if this deed is held operative against them, their claims are entirely defeated.

2. It remains to be considered whether the deed, according to the terms it purports, is legal and valid; or by legal construction is it fraudulent and void?

The late decision of the Supreme Court of the United States, in the case of *Brooks v. Marbury,*[a] before alluded to, and which is urged on both ·sides of the question, does not fully embrace the doctrine, but as far as it goes, is against the validity of this deed. It admits the principle which has been often sustained, that a debtor in failing circumstances or otherwise, may lawfully prefer one creditor or any number of creditors to others, either by the direct sale of property to them, or by an assignment in trust for their use, provided, it be done in good faith, and the preferred creditors "give their assent at the time of the execution, or if they subsequently assent in terms, or by actually receiving the benefit of it." In that case, the assignment was made to secure payment of debts created by the forgeries of the assignor, the real existence of the debts was fully shewn, the property was described with reasonable certainty, the preferred creditors were to be fully paid, after which the residue of the estate was absolutely appropriated for the benefit of the other creditors generally, without the condition of a release. It was understood, however, there would be no residue, and if the deed was valid, the debts due the favorite creditors would be paid, to the exclusion of all others; if invalid, the whole proceeds must go to the attaching creditors, in the order in which they stood, to the exclusion of those for whose benefit the deed was made, and others. Under these circumstances, Chief Justice Marshall, said, "it was a mere question of legal preference, unmixed with any equitable considerations whatever." He also said, "deeds of trust may and have often been made for the benefit of persons who are absent, or even for persons who are not in existence, and that the assent of the persons for whose benefit they are made, has never been required as preliminary to the vesting the legal estate in the trustees. He adds, however, that if the pre-

ferred creditors had refused their assent, the assignment would thereby have been avoided; but that "real creditors, are rarely unwilling to receive their debts from any hands which will pay them; and no such unwillingness can be gratuitously ascribed to the holders of forged notes."

In reference to the expressions of the Chief Justice, as to the necessity of the assent of the *cestui que trust*, the same remark applies, that was used by him in the same case in allusion to certain remarks of Chancellor Kent, "that they must undoubtedly be understood in reference to the case in which they were used." His language entirely excludes the idea that in no case was the assent necessary to the validity of the deed, but he gives ample reasons why the assent should be presumed in that case; that as the preferred creditors were the innocent holders of forged notes, they would doubtless be willing to receive payment from any source. And compared with this case, other reasons equally strong may be added. The condition of their assent was not a release of all claims on the person of the debtor, or such parts of his estate as might be fraudulently concealed, or which he might afterwards acquire, as is the case here. And in that case, the assigned property being designated and described, the creditor could scrutinize the assignment and ascertain the faith in which it was executed. Here they are left without the slightest estimate or description of the amount, kind or locality of the assigned property, except that it is all the personal estate, claims or demands, and all the lands in Georgia and Alabama, which the firm owned jointly, but not individually. Hence a creditor who might wish to examine the motive for the assignment, and the prospect of payment under it, so as to make his election, whether to join in the execution of the deed or not, must roam through the United States, without the usual and necessary means of making the discovery.

And in this place it is necessary to notice what I consider a prominent objection to this deed; it expressly excepts, from its operation, all the separate or individual property, belonging to each of the persons composing the firm. Who can say, their separate property does not exceed the value of their joint estate, or that it does not bear a large relative proportion to it; or that they did not preparatory to this assignment, use the precaution to have no individual debts, and increase their separate property out of the joint stock? It is a rational presumption that their separate property is sufficient to constitute a reservation, which, if expressed in

the deed, would exhibit the most glaring fraud. Nor should the fact escape notice, that they assign only such lands of the firm as lie in the two States; what quantity of real estate they may jointly own in the State of New York, where they reside, or elsewhere, is in no way shewn or estimated. The presumption is strong, that there was a deep and secret motive for this vague, yet efficient designation.

By the rule of decision which has uniformly prevailed in Connecticut, assignments less exceptionable than this, have been adjudged fraudulent and void, as to creditors who do not assent to the terms. The principles of a case reported in 4 Day, 146, were these, "A., being in failing circumstances, executed a deed of assignment of certain credits to B. in trust, for the payment of all A's creditors, in proportion to their respective claims. Two schedules were annexed, the first specifying the names of several creditors, and concluding thus: "and others, to the number of about twenty creditors." The other specifying several debtors, with the amount of their respective debts, and concluding thus: "and many more to the amount of more than $10,000." That assignment was made *bona fide,* and due notice given to the creditors. The creditors named in the schedule, had no knowledge of the assignment at the time it was made, but none of them afterwards dissented, except C. who did dissent. B. was agent to a number of the creditors; he accepted the trust, and proceeded to make collections. It was held, that the assignment was void in law, and that C. was entitled to recover the credits assigned by process of foreign attachment."

In the Courts of New-York, a doctrine has prevailed more favorable to assignments in trust for the payment of preferred creditors, than in any other tribunal of equal authority. But even there, I think the principle has not been carried so far as to sustain this deed, supposing it in fact to have been executed by the persons who purport to have signed it as creditors.

*a* 14 John. R. 458.

In the case of *Hyslop v. Clark,[a]* a schedule was annexed to the deed containing all the property conveyed with a particular description thereof. The deed contained a stipulation, that in case any of the creditors should refuse to release their demands against the assignors, then, in further trust, to pay such of their creditors as they should appoint; certain of these creditors refused, and it was held that the trust failing as to them, resulted for the benefit of

the assignors; that the deed was therefore void by the statute of frauds, as to other creditors; and being void in part, was void in the whole on the ground, that it tended "to delay, hinder and defraud creditors." The same I conceive may be said of this deed.

It was, however, held in the case of *Murry v. Riggs*, [a] that the deed of assignment may exclude from its benefits such creditors as neglect or refuse to assent to the assignment within a limited time, throwing the distributive shares to which they would have been entitled, into the general mass for the benefit of other creditors provided for by the deed.

But in a subsequent case, *Austin v. Bell*. [b] Spencer, Chief Justice, reviewing the case of *Murry v. Riggs*, remarks, that Chief Justice Thompson, in delivering the former opinion, observed that "for any thing appearing, all the creditors of Murry & Co., the assignors, were satisfied with the assignment, and the provision therein made for the payment of their debts." In this case, the reverse is the fact. He went on to say, "this is an important feature in which the case of *Murry v. Riggs*, was distinguishable from that of *Clark & Hyslop*, and that Chief Justice Thompson in the same case assented to the decision in *Hyslop v. Clark*, and it could not be inferred he intended to overrule it by any thing said in the other case. The deed in the case of *Austin v. Bell*, was executed by persons composing a mercantile firm, to trustees, for the payment of the debts of the firm. It conveyed all their estate, joint and several, real and personal, their wearing apparel and household funiture excepted; and also the debts and demands due to them, either jointly or severally; the directions of the trust were among others, that the creditors named and classed in a schedule annexed, should be paid in the order in which they were classed; provided, they should within a limited time, become parties to the deed by executing the same; and upon the further trust, that in case any of the creditors named should not, within the time, become parties to the assignment, then the grantees should pay to the grantors, the proportion of such creditors who neglect or refuse. The deed also contained a release similar to the one before us. Very few of the creditors executed the deed, and among those who refused were the creditors whose claim was in contest. Some, however, did execute, which afforded the deed all the aid that can be derived from the assent of one or a few of numerous credi-

tors. The Chief Justice, in that decision observed, that "without in the least impugning the doctrine, that a man in debt has a right to give a preference to creditors, I am bound to say, that a deed which does not fairly devote the property of a person overwhelmed with debt to the payment of his creditors, but reserves a portion of it to himself, unless the creditors assent to such terms as he shall prescribe, is in law, fraudulent and void, as against the statute of frauds, being made with intent to delay, hinder or defraud creditors of their just and legal actions." It is admitted, this decision was mainly influenced by the provision in the deed, that the proportion of the dissenting creditors should be paid to the assignors in the event of their refusal. But if all assented, there was no reservation, so that it could only be created by the act of the creditors in refusing their assent, and the whole of the property held jointly and severally was conveyed. It was not subject to several objections applying to this: here is shewn to have been an absolute reservation of all their separate property and all the lands of the firm, except such as are situated in Georgia and Alabama; besides the implied reservation of whatever residue may result from the refusal of part of of the creditors, to execute the deed, or of the whole, if all had refused.

The Supreme Court of Massachusetts, in the case of *Ingraham v. Geyer*,[a] decided, that an assignment in trust for such creditors, as should within a certain time become parties, and release their demands, is void as against the dissenting creditors.

*a* 13 Mass. R. 146.

On the other question raised in the argument, whether a voluntary assignment for the benefit of creditors valid by the *lex loci*, can affect the rights of creditors in another State or nation, than where made, I decline the expression of any opinion at present, as it could avail nothing in this case, and is considered by many of the first jurists as an important, and unsettled question of international law.

But for the reasons that the deed is not shewn, or in any manner avered to have been executed by either of the assignees or creditors; that the plaintiff and many other creditors have refused their assent, which was required to entitle them to any interest in the deed, and could only be given on terms of releasing their demands against the debtors, that all the individual property of the debtors, as well as any real estate owned by them jointly, except in the two States, is reserved, and because no estimate, inventory or

other discription is given of any of the property, I am of
opinion, the deed as presented, is in law fraudulent and
void, and that the judgment below should be reversed;
consequently, I dissent from the opinion of a majority of
the Court.

JUDGE PERRY also dissented.

Judgment affirmed.

THE CHIEF JUSTICE having presided below, did not sit.